The opinion of the Court was delivered by
WáRDLaw, Ch.
One of the questions presented by this appeal is, whether the carpenters and boat hands of the testator pass under the following devise: “ I give to my daughter, Ann Ashby Colburn, for and during the term of her natural life, without impeachment of waste, and without being subject or liable in any manner whatsoever, either as to the body or income of said estate, to the debts, contracts, liabilities, control or interference of her present or any future husband, my house and lot in Charlotte- *243 street, where I now reside, and my bouse servants and furniture used in said bouse; also my plantations, Mildam and Tibwin, and a tract of land called Elatfield, and all tbe slaves, cattle, bogs, borses, mules, sheep and poultry, and tbe tools, utensils, flats, boats, furniture, carts, wagons, and every other thing usually used, attached and belonging to the said house and plantations; and, after her death, then to her daughter, Mary Anna Mathewes Colburn, her heirs, executors, administrators and assigns forever; but should the said Mary Anna Mathewes Colburn die before she attains the age of twenty-one or day of marriage, then I give the said property, so given to her, to the children of my daughter Susan, to be equally divided amongst them.”
This clause immediately succeeds another, by which the testator gives to his daughter, Susan B. Hunt, for life, in the same terms-as to impeachment for waste and control of any husband, his lot of land, with the buildings thereon, in Washington-street, Ma-zyckborough ; his wharf lot in Mazyckborough; his plantation, called Pleasant Meadow, including the high and pine land; his plantation, Springfield; his plantation called Snee Farm; his Ferry place and Ferry; also his tract of land on Wambau creek, “ and all the slaves, cattle, hogs, horses, mules, sheep and poultry, and the tools, utensils, flats, boats, carts, wagons, furniture, and every other thing usually used and attached to and belonging to the said plantations and ferry and after her death, then to her children living at her death, the issue of a deceased child or children to represent and take his, her or their parent’s share ; and should any of her children die without issue living at his or her death, then to the survivor or survivors of them, share and share alike.” The will also contains a pecuniary legacy of $12,000 to the children of Mary Boyd, a deceased daughter of testator; a direction that his estate be kept together until, from the crops and other income, the pecuniary legacy above mentioned, and the debts of testator should be fully paid and satisfied; and a devise of the rest and residue of his estate, in equal shares to his daughters, Mrs. Hunt and Mrs. Colburn, “subject, however, to the *244 trusts and limitations herein declared of the property herein devised and bequeathed to them.” Another clause of the will has some bearing as to the question concerning the carpenters, and boat hands, certainly so far as Nat, one of the boat hands, is involved: “ It is my will that my slave, old Nat, (commonly called Capt. Nat,) and old Patty, the dairy woman, at Tibwin plantation, and old Anne, the poultry woman and nurse at Snee Earm, be allowed to remain and reside on the plantations where they now respectively are and reside; and I request my daughters, in consideration of the faithful services of the said slaves to me, that they will treat them with all the kindness consistent with their state and condition, and pay to each of them the sum of ten dollars annually during their several lives.” Of the 370 slaves owned by the testator at the time of his death, none is named in the will except the three mentioned in the last clause, who are severally denominated old, and recommended to the special kindness of the two principal legatees. Of the whole number of slaves, according to the circuit decree, Mrs. Oolburn would take 204 and Mrs. Hunt 166. It is likely that the real estate devised to Mrs. Hunt is of greater value than that devised to Mrs. Oolburn. There is, however, no distinct expression in the will of the purpose of the testator to make equal donations to these two legatees for life, except as to the residuary estate. The remainders after their life estates severally are quite different.
It is manifest from the testimony, that the six carpenters were not usually, or for the greater portion of their time, employed or ■‘ used ’ upon any of the plantations devised to Mrs. Oolburn, nor ‘attached’ nor ‘belonging’ to any of these plantations, except that some of them had their cabins and patches at Tibwin, and some at Mildam. They were as a corps separated from the laborers of 'the plantation and never engaged in agricultural operations, except for a short time upon some sudden emergency. In the winter, they worked at their trade at the various places of the testator, as the exigencies of these places required their peculiar service; and in the summer, they were usually let to hire in the *245 city of Charleston. The testator mostly resided at Tibwin in the winter, and at Charleston in the summer, Tibwin was the original hive from which the-other plantations were chiefly settled. An ‘ allowance ’ list, and a ‘ working ’ list, were kept by the overseer at Tibwin; and the carpenters were on the former list, but not on the latter; which, however, also omitted the names of such of the negroes as, from being superannuated or immature, were unfit for labor. Put it appears that the carpenters drew their rations indifferently from the plantations of the testator, wherever they happened to be employed.
The facts concerning the boat hands are of the same general character. They, too, were detached from the operations of Tib-win. Their ordinary employment was on board the sloop of the testator, in carrying to market the crops from his several plantations, of which Pleasant Meadow, devised to Mrs. Hunt, was most productive; and in carrying wood to the Eerry, devised to Mrs. Plunt, which was navigated by steam.
It is manifest, that the words “ usually used, attached and belonging to the said plantations,” or some of them, must limit and qualify the bequest of slaves to Mrs. Colburn, as otherwise the description of the subject, “ all the slaves,” evidently referring to something to'be added, would either carry all the slaves of the testator to this legatee, which is inconsistent with the whole scheme of the will, or would be defective and unmeaning. Whether the words “usually used” form part of the description of the slaves bequeathed, or. are to be confined to the tools and other inanimate things bequeathed, is too doubtful for the matter to have much effect either way in the present discussion; and it is too unimportant to be closely considered.’ The remaining words, “attached and belonging to the plantations,” are properly conceded to be descriptive of the slaves bequeathed. In a strict sense, slaves ‘ attached ’ to a plantation are like some of the ancient villeins of England and some of the modern serfs of Russia, adscripti glebx, inseparably connected with the soil: and by the most liberal construction that can be tolerated, slaves ‘ attached to a plantation ’ *246 must be connected with the agricultural operations of the place, either as actual laborers, or as those who have been laborers, or are expected to be laborers. The superannuated and the immature, closely connected with the actual operatives, are in the same predicament as laborers. There is scarcely a perceptible shade of difference in meaning between slaves attached to a plantation, and slaves belonging to a plantation.
It is obvious from the whole tenor of this will, that the testator used the term plantation in a sense somewhat strict, as a place where agricultural operations are conducted. In the devise to Mrs. Hunt, he speaks of Pleasant Meadow, Springfield, and Snee Earm, each as a plantation, and eontra-distinguishes them from his Eerry place and his tract of land on Wambau creek; and in the devise to Mrs. Colburn, he speaks of Mildam and Tibwin as plantations, and of Elatfield as a tract of land. To the latter, he also devises a house and lot in Charlotte-street and ‘ the house servants and furniture used in said house.’ To Mrs. Hunt he gives the slaves appurtenant ‘to the said plantations and ferry,’ and to Mrs. Colburn, he gives the slaves appurtenant ‘ to the said house and plantations.’ Under this bequest to the latter, 165 slaves, answering all the terms of description, pass without dispute, and it is claimed that there pass 12 more, the carpenters and boat hands, who belong to the plantations in some loose and indeterminate sense only.'
Where the terms of a gift, describing the subject, refer to extrinsic facts, we necessarily resort to parol evidence to ascertain what is comprehended within the terms of description. In the present case, we must learn from the mouth of witnesses what slaves are attached and belong to the plantations. But where the context of the instrument of gift affords no contrary indication, we must always understand the words of the donor, descriptive of the subject of gift, in their strict and primary sense, if a subject be found to which the words so interpreted apply; and evidence of extrinsic facts, such as the intention of the donor as an independent fact, is inadmissible to apply the words to any other sub *247 ject. If the terms of description, strictly interpreted, apply to one subject, they cannot be made to apply to another subject in a secondary or deflected import. Wigram on Wills, 17. Thus in Oxenden vs. Chichester, 3 Taunt. 147, 4 Dow, 65, under a devise of testator’s 1 estate of Ashton,’ where an estate situated at Ashton was found by the evidence, other lands of testator not situated at Ashton were not allowed to pass, although testator called the whole by the name of his ‘Ashton estate,’ and his steward kept the accounts relating to the same under that name, and conclusive evidence was tendered of the intention of testator to devise the whole estate. The present will affords an illustration. It has been already decided in this case, .that, under the bequest of ‘ flats and boats,’ the sloop of testator is not given to Mrs. Colburn. It may be remarked, that the consistency of the construction of this will could be hardly vindicated, by which the sloop did not pass, and the hands, the instruments of navigating it, did pass; both, if one, being appurtenant to the plantation of Tibwin.
Against the conclusion to which this reasoning tends, the master relies upon the fact, that the carpenters and boatmen had their patches and cabins at Tibwin. But this fact has little weight, when we remember that Tibwin was the original place of testator, and when we consider the intermixture of the families of slaves of neighboring plantations. If a negro who has a wife, and a cabin, and a patch on a plantation, is to be regarded as belonging to it, many slaves would be within the description who are owned by others than the proprietor of the plantation.
The Chancellor, who adopted, with much hesitation, the eonqlusion of the master, was impressed by the consideration that the testator thoughtfully provided for the comfort of three old negroes, and yet left the disposition of his valuable tradesmen to doubtful interpretation of his will. The absence of specific disposition concerning these particular negroes has little influence, for it is the scheme of the will to dispose of testator’s slaves by general terms of description, without enumeration; and there is no ground for preference of the special bequests to Mrs. Hunt and Mrs. Colburn, *248 over the residuary clause, in which the testator, by careful provision as to trusts and limitations, manifests his purpose of leaving a valuable residue.
It is argued that the declaration in the will, that old Nat and old Patty £ are and reside ’ at Tibwin plantation, is as true of all the other slaves in controversy as of Nat, and demonstrates that they are ‘ attached and belonging ’ to that plantation. If this declaration be made concerning Nat, which is ambiguous, still mere residence at a plantation does not make a slave appurtenant to it. Besides, the express disposition of Nat by this clause of the will, leads to the conclusion, that the testator had not intended to describe him by the general words of the previous bequest to Mrs. Colburn : and the same application of the general words must be made to all who are in the same category. It seemed to be conceded at the bar that Nat was bequeathed to Mrs. Colburn by the latter clause; and we are content to allow this construction.
The evidence that the slaves in question were included in the inventory of property at Tibwin — a subsequent arrangement for convenience — if admissible, has no influence on the construction of the will; and, I think, was inadmissible.
In our oj)inion, the carpenters and boat hands are bequeathed by the residuary clause of the will.
The next matter of appeal relates to what are called the Thompson negroes ; and involves the question whether the debt for which the estate is liable on account of these negroes, .as between the two principal legatees, constitutes a charge upon the estate generally, or a specific lien upon the negroes themselves.
The slaves denominated the Thompson negroes were, at the time when they were respectively purchased, 19 in number, namely, Zacharias, Caesar, .Bella, Paul, Fanny, August, July, Abraham, Sarah, Liddy, Wanetta or Henrietta, Joe, Polly, Liddy, Nanny, Caroline, Amy, Die and Chaplin.
Of these slaves, B. P. Colburn, husband of Ann Ashby Col-burn, purchased Zacharias from Poyas, executor of Ball, on January 10, 1845, for $610, and, paying a portion of the purchase *249 money in cast, for tbe balance gaye the bond of himself and testator of same date for $406, with interest from date, payable in three equal annual instalments, the last being on January 10, 1848; and on same day gaye a mortgage of the slaye to secure the bond. The interest on this debt was paid by Colburn to June 10,1848.
On February 13, 1845, B. P. Colburn purchased from S. M. Pringle, for $5,380, Csesar, and the nine following in the order of names aboye, and paying a part of the purchase money in cash ; for the balance gaye the bond of himself and testator for $3,900, with interest from date, payable in three equal annual in-stalments, the last being due on February 13,1848; and on same day gaye a mortgage of these slaves, (and of another named Frank,) to secure the bond. Interest has been paid to June 8, 1848.
On February 10, 1846, the testator purchased from E. Gr. Huger, for $2,500, Joe and the seven following in the order of names above, and on same day gave the bond of himself and B. P. Colburn for $1,666.67, with interest from date, payable in two instalments on February 10, 1847, and February 10, 1848; and on the same day gave a mortgage’of the slaves to secure the bond. Interest has been paid to February 10, 1848.
These three mortgages were duly recorded.
An indenture was executed by the testator and B. P. Colburn, August 21,1847, by which Colburn in consideration of his indebtedness to testator in the sum of $7,795 on promissory notes drawn by Colburn and indorsed by testator, conveyed to testator the Thompson land, (which, it seems, by statements at the bar, Oohrarn had purchased for $600 in cash,) and the nineteen negroes above named, with four others, Maria and Thomson, children of Liddy (Pringle,) and a child of Amy and a child of Nanny, to testator, in trust, for the separate use of Ann Colburn for life, not liable to the debts of her existing husband ; and if she should survive, without issue of the marriage, to her in fee; and upon her death, leaving her husband, B. P. Colburn, and issue of their bodies, for the joint *250 and equal use of such husband and issue, without liability for husband’s debts, for the life of B. P. Colburn, and on his death to the issue; and if B. P. Colburn should survive his wife, without issue of the marriage, then the whole to him for life, with power of appointment by will as to one-half, the other half descending to the next of kin of his wife. The notes referred to in the consideration of said deed were drawn and indorsed from October 3 to December 18,1846, and were payable from January 2 to March 18, 184T.
The will of the testator bearing date January 21, 1848, contains the following clause: “ And whereas, in and by a deed bearing date the twenty-first day of August, in the year of our Lord one thousand eight hundred and forty-seven, made by and between myself and B. P. Colburn, the said B. P. Colburn, in consideration of the debt stated in said deed, and my release of the same, conveyed to me a plantation and twenty-three slaves, therein described, for the trusts and purposes set forth in said deed; and whereas the said plantation and negroes were purchased and paid for by mo, now I do direct, as a condition precedent to the bequests and devises, by me herein made to my daughter, Ann A. Colburn, and my granddaughter, Mary A. M. Colburn, that the said plantation and negroes mentioned in said deed, so far as shall lie in the power of the parties interested therein, shall be held, not to the uses, trusts, and limitations declared in the said deed, but to the trusts and purposes declared in this my -will of and concerning the property devised and bequeathed to my said daughter, Ann, and her child; and on failure of the parties interested conqfiying with my will in this particular, I revoke and annul all of the devises and bequests herein made to them; and I devise and bequeath the property above devised and bequeathed to them, to my daughter, Susan B. Hunt, and her children, subject to the same trusts, and for the same estates, as the property herein devised and bequeathed to them is subject to.”
It has been already decided by the Court of Appeals, that, in this clause, the testator did undertake to devise the Thompson *251 land and negroes, so as to subject the parties interested therein to an election to take under the will or the deed, aüd so as to subject this property to rateable liability for the debts and pecuniary legacies of the testator. Mr. and Mrs. Colburn have elected to take under the will, and their infant daughter under the direction of this Court has made the -same election.
The argument for the appellants proceeds on the assumptions; that the testator declared in his will, which must be assumed to be true, that he had purchased and paid for the Thompson land and negroes ; that in this statement a's to payment he referred to his -indorsement of the notes óf B. P. Colburn, which, as to liability upon the maker, he had released by the deed of August 21, 1847; that these notes were drawn and indorsed to raise money for the discharge of the bonds given foi’ the negro'es, and that by subrogation of the representative Of the testator to the liens of the mortgagees; 'or some general equity, th'e n'egrOes should be subjected to liability for the unpaid purchase money contracted to be given for them.
The foregoing statement of facts shows that there is ho basis for this argument. When the testator ddfelared that he had purchased and paid for this property; he manifestly meant that he had been obliged to pay $7,795; the sum of the notes indorsed by him for his son-in-laW; not th&t he had paid the original purchase money of the slaves. There is no evidence whatever that 'these hotes were drawn and indorsed to raise money for the payment of t^p bonds given for the original purchase of these negroes, in one of which testator was the principal, and in the Other two surety; and all the probabilities of the case are on the other side. The notes are ten in number, for th'e sum of $7,795, all payable in the early part of 1847; the bonds are three in number, fdr the aggregate sum of $5,912.67, the last instalments of which were payable in the early part of 1848. There is ho conformity in date, sum or maturity. Th¿ fact that the interest on these bonds was punctually paid, is treated as evidence Of fraudulent concealment from the testator that the bonds were outstanding and un *252 paid; but we do not perceive bow compliance with legal obligation is evidence of fraud, nor bow tbe testator could have been deceived into tbe belief that his own bonds, in one of which be was principal debtor, were paid before maturity by an insolvent son-in-law. He bad constructive notice of tbe existence of tbe mortgages from their being recorded, in all probability actual notice ; and there is not a tittle of evidence of any misrepresentation to him. Sufficient reasons, which are set forth in the appeal decree, existed for his change by will of the trusts set forth in the deed of August 21,1847, which were doubtless satisfactory to him at the date of the deed, as they were in exact conformity to the marriage settlement between Colburn and his daughter in 1884.
It appears to us that -this branch of the case is governed by the authority of Francis vs. Lehre, 1 Rich. Eq. 271, with which we are satisfied. There Ann Lehre purchased a plantation, and for the payment of the purchase money gave her bond secured by a mortgage on the plantation: she afterwards made a voluntary gift of the plantation in trust for Mrs. Raker, and then died leaving the bond unpaid. It was held, that her estate was bound to pay the bond and release the land from the lien of the mortgage. The Court, referring to Villers vs. Beaumont, 1 Vern. 100, scouts the proposition that one may purchase property, then make a gift of it, and afterwards revoke the gift by compelling the donee to pay the donor’s debt. Substantially the testator was the settlor in the deed of August, 1847, as he paid the consideration and directed the trusts.
We are of opinion that the present appeal is a naked attempt to make a legacy to a wife and daughter liable for the debt of the husband and father, who takes no interest under the will; and we conclude that the general estate of the testator must pay the testator’s debts.
The next subject of appeal is in reference to the executor’s accounts. All the objections to the report of the master in this matter were abandoned at the hearing here, except in relation to the account of Messrs. Yeadon & Macbeth, the counsel of the *253 executor; indeed these matters were adjudged by the former appeal decree. In relation to this account of the counsel, the Chancellor directed an issue at law; and the executor appeals from this order. The counsel fee in this case was paid by the executor after the date at which he was directed by the order of this Court to pay over the funds in his hands to the master. We are not disposed to interfere with the order of a Chancellor in a matter of discretion. To guard against. misapprehension, it is proper to say that we do not recognize, as a rule of procedure, that a Chan-cell or must direct an issue at law in case of dispute between client and counsel as to the amount of compensation. The organization of this Court affords the means of trying and determining such a question satisfactorily. Much less are we inclined to abandon to the other Court the determination of the question as to what party shall be liable for fees that are reasonable. The adequacy of the compensation is distinct from the liability of the party to pay for the seryices. It may be that large compensation is due to counsel for seryices to a trustee; but that the trustee is litigating for his own benefit and should himself sustain the expense. We are content as to the Chancellor’s order in this particular, as a matter of discretion, so far as the quantum meruit is concerned; but we reserve the right of determining who shall pay the reasonable fee.
The appeal brings further into question the extent of land, passing as residue, and ordered, as it is said, to be sold for partition, including, it is said, some land exclusively claimed by Mrs. Hunt. No order for sale of such residue has been produced to us, and we conclude nothing as to the title of the parties. If there be an order for sale, the master should not sell disputed premises, but he should inquire into the facts and report to the Court. This matter is reserved.
It is adjudged and declared, that the carpenters and boat hands, except Nat, are not bequeathed to Mrs. Colburn, but pass under the residuary clause of testator’s will; and that Nat is specifically *254 bequeathed to Mrs. Colburn : and it is ordered and decreed that tbe account be taken by the master accordingly.
It is further ordered and decreed, that the issue at law directed by the Chancellor, as to the account of Yeadon & McBeth, be confined to the reasonableness of the compensation claimed for the services rendered by the counsel.
It.is further ordered and decreed, that in all other respects the circuit decree be affirmed and the appeal be dismissed.
JOHNSTON, UuNKlN and Dah&AN, CO., concurred.

Decree modified.